Good morning, Your Honors. May it please the Court, Colin Hawley for Petitioner Troy Valdez. If I may, Your Honors, I'd like to start by addressing in a little bit more detail one of the three main issues we presented in our brief, in terms of the errors we believe the district court committed. And this is the issue of whether there was a unilateral mistake warranting rescission of the Mesa Top operating agreement. And, again, we did address this in our brief, but I wanted to just emphasize a couple of points with respect to that issue. Now, the district court provided a relatively short memorandum of opinion in this case. And with respect to the unilateral mistake issue, the district court's decision is extremely short. And after stating the elements of a claim for rescission based on unilateral mistake, the court says nothing more than, Mr. Valdez did not prove that Mr. Neuman knew or had reason to know that Mr. Valdez expected the $265,000 debt to be paid immediately upon verification or the payment of a $15,000 monthly salary. That's the entire decision based on unilateral mistake. And, again, I would point to the fact that the district court did not prove that Mr. Neuman knew or had reason to know that Mr. Valdez expected the $265,000 debt to be paid immediately. And, again, I would point to the fact that the district court did not prove that Mr. Neuman knew or had reason to know that Mr. Valdez expected the $255,000 debt to be paid immediately. What evidence is there to demonstrate that there was any expectation for the debt to be paid immediately with an emphasis on the word immediately? The expectation comes from two things. One, from the language of the contract itself. And specifically what states that something must be done immediately? The provision itself provided that the debts were to be paid upon verification. Okay? The word immediately, we can turn to the provision itself. What page are you looking at? Page 300. You're looking at the contract, huh? Yes, Your Honor. The paragraph 8? Yes. It's set forth on page 10 of our opening brief. And the provision is section 8 of the Mesa Copyright Act. Well, what it says is that the debt will be assumed upon verification. Correct. Okay. When you assume a debt, that doesn't necessarily mean it's payable immediately. It's payable whenever it's payable, but... Well, it says, Your Honor, it's assumed upon verification. It's assumed upon verification, not paid upon verification. The assumption of a debt is not necessarily coextensive with the payment of a debt. Well, that may be the case, Your Honor, that that language is not precise. And that's exactly why we, at the trial level and again on appeal, have focused on... It's pretty precise. I mean, I'll assume the obligation. It doesn't mean you're going to pay them right now, but I'll assume, you know, I'll assume the obligation to pay off your... to make the payments remaining on your vehicle. That doesn't mean that I'm going to pay them right away. You know, as they come up, I'll make those monthly payments. And on verification, it means I want to see the payment book or whatever it is. And I'm going to check with the company to see whether this is legitimate or not. Let me ask this. Were all of these debts overdue? They were, of all the debts, and again, there were five separate debts. They were all currently due at the time of contracting with the exception of one debt, which was the debt to Michael Kerr, and that's the debt that was secured by all the stock in B2 Brands, Mr. Valdez, the company Mr. Valdez started. There were actually two aspects to that debt. There was an $80,000 loan and then a separate $70,000 loan. The $80,000 loan came due within a matter of weeks after the contract was formed. The $70,000 came due on December 20th of that year. And I would say, in response to Your Honor's point about how the word assume should be understood, I think your point exactly supports our argument, which is assume upon verification it was understood by the parties, both parties, I must say, based on their testimony, to mean the debts would be paid when they came due, provided they were verified that they were in fact incurred and were in fact due. To use your analogy about, okay, I'm going to take on your car payments, so the parties would have understood in that instance that the car payments would be paid on a monthly basis as they came due. Here, the debts were due. They were due at the time of the contract. Well, you said some were and some weren't, in answer to Judge Fletcher's question. Most were due. There was one debt that was not due that came due within weeks, in part, and then came due in December of that year. So did Mr. Newman So what specifically was the mistake that you allege? Well, as we stated in our brief, it's our position that the parties actually agreed on an interpretation that's different from what the district court found. And that's I want you to tell me now, not just refer me back to your brief. Sure. What specifically was the mistake? Well, again, that's an alternative argument. If there was an interpretation of this contract, if the correct interpretation was that Mr. Newman had unfettered discretion to pay on whatever timetable he chose, then clearly there was a unilateral mistake in that Mr. Newman, through his discussions with Mr. Valdez and the language of the agreement, caused Mr. Valdez to believe that the debts would be paid upon verification that they had been incurred and when they came due. That was Mr. Valdez's understanding. Well, wait a minute. I'm sorry. Go ahead. Well, I wanted to pass away from assumption of debts and payment to verification. Did the verification mean simply that the money was owed or that it was owed in connection with the development of the product? The testimony of the parties, I think, matches up and shows that it was verification that those debts had been incurred. And, in fact, if you looked at Mr. Newman's testimony, we highlighted it on page 2 of our brief, but he repeatedly testified at trial that his agreement that he expressed to Mr. Valdez was, I'm going to verify that these are real. He used the word real over and over again. Once I verify they're real, I'll pay them or I'll assume them, which, again, to Mr.  And the word real, and, again, Respondent's counsel likes to twist the word real into a bunch of different meanings, but the most common way to interpret the word real, as Mr. Newman testified, is that they were incurred and that they were due. He didn't testify, I told Mr. Valdez, I'm going to find out what these debts were specifically for, investigate how he used the money, et cetera. My question is very similar to Judge Fletcher's, but it's your understanding of this contract that the debts would be assumed and or paid no matter what they were for, even if it was to get a big birthday bash for his kids or something. It didn't have to be business related. You don't think that's part of the party's understanding here? I don't think that that's part of the understanding. I think the understanding was that there was going to be an annexed Exhibit B, which was specifically referenced in Section 8 of the agreement. They discussed that that would be annexed and that that would add up to $265,000,  Newman wrote, we're still unable to verify that the $265,000 that you seek or $265,000 that you seek to be reimbursed for is for company debt. That is, it's not business related. That's the end of the quote. The response wasn't, oh, gee, well, I don't have to show that. His response was, no, this includes only expenses that were invested in the company for various purposes. And I'll end that quote also. So it seems like there was a mutual understanding, from that writing at least, that the expenses had to be for the company, for legitimate purposes for the company. That is, business related. And that statement by Mr. Valdez is certainly understandable because, from his perspective and the evidence overwhelmingly shows, these debts were business debts. So this is a bit of a red herring in the case. These were business debts. It's part of what the court looked at in determining from extrinsic evidence that the party's intention was that before something was, that verification before assumption had to do with whether it was business related. The court did say that in other sections of the opinion. But if you look at the record, Mr. Valdez provided over and over again evidence that these were business debts. If you look at what the debts were, there was a debt to a company. That's a different question. Judge Fletcher started by asking you whether verification included verification of proper purpose. And you started by saying no. But now you're saying, well, in fact, they were. No. My answer is that the party's understanding was that no, that was not something that needed to be proven. But if the court determines that it did need to be proven, the evidence shows that that was, in fact, showed to the respondents. He did show that it was business debt after the time of contracting because he was asked by Mr. Newman and his agents, well, show me this is a business debt several months later and during the course of their time together, dealings together. And he did do that. So whichever way you look at it, Mr. Valdez, you know, provided the verification that was due under the contract. Since your time is limited, I want you to turn to another question. Yes, Your Honor. Your client wants to void the contract. Correct. Now, what if it's not voided, what is left? Now, Mr. Newman's not willing to go forward with production. He's formed another company that doesn't include your client. If the contract is not voided, what's left to be performed, what's left to be done except to pay those debts? Well, Your Honor, and part of your question goes to the issue of abandonment of the contract. And, yes, Mr. Newman did start a new business in December. However, he immediately in January, after checking out whether he thought this would be a profitable business, decided to abandon. And that's based on the testimony of his own agents. What I'm asking you is what's left to be performed? Well, since Mr. Newman never performed, he didn't continue with the business, I guess the only issue is if the contract is voided, whether Mr. Valdez will go forward with the business now that he knows at that point that his rights are free and clear. Now, the reality is there's a second case in the district court in front of Judge Carney now that's actually been reassigned to Magistrate Gold. But that's an ongoing case relating to how the rights are going to play out if there's no rescission. But you can't tell me what Mr. Newman or his new company has to do if the contract is not voided. What's there? Well, the problem is that there's now another set of parties involved that purchased Mr. Valdez's rights and B2 Brands' rights as good faith purchasers. So there's another issue there to be resolved. So it's not a clean situation in terms of what happens going forward between these two parties. So are you saying that he then sold what Newman had to someone else? No, Your Honor. Mr. Valdez affected the rescission. And under California, actually Nevada law of rescission, he's in. Then he, several months later actually, in May of 2006, entered into a separate deal where he essentially sold all of his rights and the rights of his company, B2 Brands, which preexisted these dealings with Mr. Newman, to another party. And then that party made some efforts to get the business going. And then that's now in litigation as a follow-on case. So now who drafted this agreement? The record shows that either Mr. Newman or his attorney or someone associated with Mr. Newman drafted the agreement. When asked at trial who drafted it, Mr. Newman claimed not to recall. And his attorney in deposition claimed not to recall. But it was presented by Mr. Newman's side or associates at a meeting with Mr. Valdez. And Mr. Valdez traveled, too. So he could not have provided the agreement at that deal. They brought it into the meeting, his associates. So it should be construed against Mr. Newman if that is what you're getting at, Your Honor. If there are no other questions, I'd like to reserve the short amount of time I have left. We got it all. Thank you. May it please the Court, James Cross before Appellees Newman and Hylo. Who drafted this agreement? I believe the record is that the complaint was drafted by, well, it was physically Not the complaint. Or excuse me, the contract. I think the evidence shows that the contract was put together by Mr. Newman's  I think her testimony was that she had a set form. She put it together. She brought it down. They discussed it. She didn't discuss it. But Newman and Valdez discussed it. He signed it. There's some conflicting testimony about when he signed it, because there is some testimony. You would agree that you would construe it against your client if there's any ambiguity. Well, I'm not so sure that's the case. With respect, I think that the rules of construction would say that. But I think it also was a negotiated agreement between the parties. And there's some particular evidence that deals with that. The evidence at trial was that this agreement was signed twice. As a matter of fact, Valdez signed it at the time of the meeting with Newman and then signed it again three days later in California, in Corona del Mar. And there's two different signatures. And he believes that he took it back with him and reviewed it further and then signed it again. So I would agree that the normal rules of construction of a contract are that it's construed against the drafter. But I think it was a highly negotiated contract between two sophisticated businessmen. Well, so sophisticated. Put a question mark after that. But why would he sign a second time? It was unclear. The testimony at trial was very unclear as to whether he signed it again. I think the testimony was, and this is a little off, but I think the testimony was is that they signed the agreement. He came back to California and he wanted to sign it again with a California date on it. And there was the payment of the first $15,000 to start paying off the debt. And so I think that the way the evidence shows is he signed it at the meeting with Newman. He took it back with him. He got the first check to start dealing with the debts. And then he signed it again. Why that happened is still unclear to me. It's still unclear to me. You're stating as fact that that $15,000 was to retire debt rather than to be a salary or an ongoing. That's what the court found, as a matter of fact. My client testified, Mr. Newman testified that that was to deal with debt. It was not a stipend. It was not a salary. And the court so found. Well, what's in the contract that would support that? Well, there's nothing in the contract that speaks to a salary or a stipend. So it's kind of the converse of that. There is nothing in any of those contracts that allows Mr. Valdez to receive salary or a stipend of any amount, much less $15,000. And Judge Carney noted that as one of the facts in his ruling that there was no agreement to provide a salary. Could it be for ongoing expenses rather than the past debt? I do not believe that there was testimony from Valdez, from Mr. Valdez on that trial. His testimony at trial was this was salary. Mr. Newman's testimony was there was never an agreement on salary. This was money to start dealing with the debts. So I don't think there was any testimony at trial as to whether it was for business expenses. In Newman's bookkeeping records, was it not recorded as salary? I think that's correct. I think his testimony at trial was that in the book, in the recordkeeping, it was noted as salary. I think he also testified he had no control over the recordkeeping. It was done by a bookkeeper. Probably for tax purposes, it would be good to record it as salary. Is that not correct? That may very well be the case, Your Honor, and I just don't know. I think the testimony at trial was he didn't know why that was done. It was done by an accountant. That was his testimony. Our standard of review of the trial court on this point is for clear error. Yes. I think very clearly it's clearly erroneous. And that's one of the main points I wanted to address today. We, and I was the trial, I was trial counsel in this case. At the start of this trial, we moved in Lemonade to exclude extrinsic evidence. We felt that the contract in and of itself was sufficient to resolve the case for the simple reason that under the contract, it said Mesa Top was the debt-assuming body, not Newman, not Helo. And we had a very simple argument that how could Newman or Helo be responsible for a breach of a payment under the assumption obligation if they weren't a party to the assumption obligation? So that was one of our initial arguments, and I actually think that Judge Carney confirmed that argument, as we've noted in our brief, in his ruling on what the agreement meant. But we moved to exclude extrinsic evidence because we felt the contract was fine. Let's look at the contract. Let's decide what it says. Let's don't hear from the parties. And we lost that motion. Those motions in Lemonade were overruled, and the Court allowed in considerable extrinsic evidence. And I think if Your Honors would look at, as I'm sure you have, look at the opinion, it's a very fact-based opinion. And if you look at the cases that are cited for the standard of review in this case, the DP Aviation case, the U.S. Financial Securities case, and the Miller case, all of those cases say just about the same thing. They say if the Court is going to look at a contract and construe it without extrinsic evidence by the rules of construction under State law, that is a matter of flaw, and that is review de novo by an appellate court. But if the Court takes extrinsic evidence and considers these circumstances and the meaning of the document as intended by the parties and how they interpret it and all those things and all the facts surrounding the execution of the contract, then it's no longer de novo review. It's a clearly erroneous review. And I think probably the best case to look at is the U.S. Financial Securities case. And it's very interesting. It presented this exact, even though it was a different contract, it presented this exact point. They had to construe some language in a settlement agreement. And the Court said the heart of this dispute on appeal was the standard of review. The appellants contended that it was an issue of law subject to de novo review, whereas the appellee's defendant asserted that it was because there was extrinsic evidence, it was a clearly erroneous standard. And the Court said we adhere to the clear teaching of a prior case and will not reverse a district court's interpretation of a contract based upon extrinsic evidence unless it is clearly erroneous. So in some respects, when we lost those motions in limine and the Court considered extrinsic evidence as to the meaning of the contract, I think at that point the die was cast as to what the appellate review would be on the meaning of that contract because the Court considered extrinsic evidence. And I think there is a portion of the brief that is kind of illuminating. Scalia. I think I have a question. I think Judge Karni has a question. I'm not sure whether Judge Karni has a question. I thought I'd heard enough on that subject. I wanted you to tell me what's left of this contract? Well, I think what's left is if the contract is reaffirmed, as Judge Karni did, they are still partners and they will proceed on to produce the product as they will proceed on. Now, does he have an intent to pay off these bills? Well, I think his intent is clearly reflected in, has been clearly reflected before the trial court that if proper verification was presented to him that they were incurred for business purposes, he would pay them, and that he had the discretion to pay them when it was appropriate and it made good business sense. And the court indicated that in a factual finding it made in the court, and I think it kind of illuminates what the court was thinking. The court said on that particular point, and this was on the fraud, this was on the fraud rulings that aren't subject to appeal, but he made this factual determination. He said Newman testified of his willingness to pay Mr. Valdez's debts when it made good business sense to do so, and more importantly, provided the debts were valid business expenses. So that's been his position from day one. I would think since the creditors are after them for payment that they're all due or soon will be all due, so that would make good business sense to pay them. But what about this validation? The other side says they furnished everything they need furnished. What's Newman's position? Well, Newman's position is, and I think it's evidenced by the record, there are kind of three chunks of debts. The first chunk is the lawyers and the brewery, and it's about $15,000. Newman gave Valdez money. He paid the debt. Those were paid. As to the second one, it was a debt to a unisource debt.  And we'll admit, he had not paid that debt by December 15th. But there's no indication in the record that he wasn't going to do so. And whether that debt was due or not is unclear, too. Counsel seems to think that that's rather clear in the record. It's actually not very clear in the record. The largest majority of the debt, some 60, 70 percent of the debt, was by the Kerr and Holloway personal loans to Mr. Valdez. And we've cited in our statement of fact that the evidence indicates that, at least as to the Kerr debt, which was some 60, 70 percent of the obligations of this 265, that wasn't even due until December 20th, five days after Valdez walked away from the agreement. So the evidence before the court was, back to the main point, the evidence before the court as indicated in this factual finding by Judge Carney is that Newman intended to pay these debts if they were verified as business-related debts when he felt in his discretion through Helo, as the managing member, it was appropriate to do so. And I think that also brings into play some other testimony that Mr. Valdez provided. I don't understand all that. But he agreed to assume the debts, and they're due, and he's verified them. So what is all this business discretion business about? Well, number one, he didn't verify them. Our position is none of those debts were verified other than the Unisource debt, which was on October 15th. Now, as to the business discretion, he was Helo. Newman, through Helo, was the managing member of MESATOC. He had certain duties and obligations as the managing member of MESATOC, and it's defined in paragraph 19 of the agreement. And he had discretion to run the business. He was the guy. He was running the business. And Valdez testified, both at trial and in deposition, that he understood that Newman had the discretion to determine when a bill was to be paid, whether it was due, whether it was verified, whether anything. He had the discretion to determine whether that bill, when that bill would be paid because he's the managing member. Would that be when they were threatened with bankruptcy? Well, there was no ‑‑ Suit by creditors? Well, there was no suit for collection prior to ‑‑ and I noted that in the appellate argument, but there was never a suit for collection. There was never an action brought by Mr. Valdez prior to the time this all exploded in December and January. I got the impression, you know, I know what assumed means of the debt. And then you have verification. All right. Now you throw in something else. Assume. Assume him. Verify him. Then it's up to his business discretion. In the meantime, isn't Valdez on the hook? Well, that's an interesting question. Number one, let me address it factually. Number one, there was never an action for collection. Never. There was a threatening lawyer on one of the debts, on the current debt sometime in October or November. There was never an action brought to collect anything. There was subsequently an action brought in March or April of the following year against Valdez. So the notion that there were collection actions and Valdez was on the brink of being thrown in debtor's prison is just not true. But Valdez owed the money, right? Well, that's an interesting point because if there was to be an assumption of the debt. This all sounds like Alice in Wonderland to me. Well, if there was. . . But it's your client that drafted the agreement. He did a draft agreement and he testified for what he meant to understood the agreement to be, to the assumption on the verification of the debt. And there had to be a verification of the debt as to whether it was related to business purposes. Now, there's kind of two issues here. Number one, the condition to payment, that would be verification and what that meant, whether it was to be business-related or not. The second aspect of it is timing. And there was never an agreement, and there is no evidence in the record, there is no evidence in the record that the parties agreed that Mesotop, through Newman and Hilo, had to pay this debt the second that Valdez presented him with appropriate verification, setting aside what that verification needed to be. In fact, Valdez testified, both in deposition and at trial, that he understood, he understood that Newman, as the managing member through Hilo, had the discretion to pay these bills when he deemed it appropriate to pay them. And see, that's the point here. That undercuts the notion that Valdez understood that this stuff was payable immediately as soon as what he considered to be verification provided. But getting off of it, getting off of the bills, your client didn't run a production run at the time that it was expected. Now, what's going to happen now? Are they going to go ahead and manufacture and disperse, I mean, and distribute? It sounds like, number one, these are very bad partners. They shouldn't be there together anymore. But beyond that, what's your client going to do? Well, I think there's a factual response to that. Number one, he did intend to proceed with the production run in January and testified so until Valdez walked in the early part of January. He did not proceed with a production run, and the testimony was, is that he was told by his lawyer not to do so because of these disputes. That's the testimony. In my view, that's a reasonable exercise of discretion by a managing member. Now, as to what's going to happen, it's been rather complicated by the actions of Valdez afterwards. Our view is and has always been that these agreements still exist, that Valdez and Newman are 50 percent members in this business, they own the intellectual property rights, and they can, if they choose, proceed to produce these alternative beverages. And Newman, his position has always been that, that they are still partners and they are going to proceed on as they deem appropriate in the business. Now, what has happened? Is it as Newman deems appropriate or? Well, I guess that begs the question as to what, who has the role to make those determinations under the agreement, under the duties and obligations of a managing member. Now, I think as a technical legal matter, he's the managing member and he could make those determinations. I think as a practical matter, it's a practical matter, he's not going to proceed on with the production of these beverages without his partner. And that's been his position all along, that these guys are partners and they're going to proceed on when these agreements are reinforced. Now, the problem of the. Do you think you ought to be referred to mediation? We have been to, we've been to mediation a couple of different times in this case, and combined with. Have you been to our court mediators? Yes, we have. We were in mediation before, we were in mediation and we brought the other case in. And what is complicated matters is that subsequent to all of this, Valdez entered into a new deal with other partners and used the same intellectual property rights that belonged to my client under these agreements to proceed on and produce the beverage. And the timing of it is such that they entered into the deal and filed this lawsuit. So what they did is they bet, it was a wager by this new group, that Mr. Valdez would win rescission and justify after the fact they're taking my client's property or his jointly owned property under this agreement. Now, that has complicated matters. But my client has sued, and I'm counsel in that case, we have sued Mr. Valdez and these other parties for interfering with this contract that was reaffirmed by Judge Carney. And that clearly contradicts this notion of abandonment. I mean, we have consistently asserted our rights, enforced our rights under the contract. So as a practical matter, it's rather complicated. We believe that what will happen is if, and what should happen is this contract will be, the district court judgment will be affirmed, these contracts remain in place, Newman and Valdez remain, for lack of a better term, partners in this deal, co-owning members in this deal, and with the right to proceed with production and the right to exercise their rights and remedies against this new group who took all the stuff, assuming they'd get rescission. Wonderful business partner. Well, I would say, to riff off your comment, Your Honor, I think that that's potentially an option. But the problem is, is that there are now a whole other group of people asserting an interest in those formulas because Valdez, instead of solving his problems with Newman or seeing if he could actually rescind these agreements, proceeded on and did other deals. And my client has been damaged because he's fighting this rescission action here. He wants to continue on up until December 15th. He was going. He was paying the bills. He paid the first chunk. He has to decide when he's going to pay them. In the meantime, Valdez is on the book. He's probably getting nervous. Who knows what's going on? It's about 260-odd some thousand dollars. But see, the problem with that, Your Honor, and with respect, that's where the verification issue plays into this whole thing. That's where the verification issue is because my clients were asking for verification that these were business expenses. They were incurred in the operation and development of the product. And Valdez said that any number of different times. He said it in pleadings. He said it in pleadings in the Pennsylvania action. He said it in pleadings in this case. And the exchange of letters in December, I think, is the clearest evidence. I mean, Mr. Valdez sends a letter saying, I want to mutually rescind on December 19th. Newman writes back a letter saying, well, look, these all debts, all these debts need to be verified as legitimate business expenses. And as noted by Your Honor, Valdez didn't come back and say, well, wait a minute, that wasn't the deal. That wasn't the deal. The deal was that these were the debts and you had to pay them. That's very clear evidence of the understanding of the parties. And I would note that in the Pennsylvania action, when we sued them. What's so hard about getting them validated? We don't know. Can't you go over there and say, here's a bill, did you incur this, did you get this product, it's a legitimate bill? What the evidence is, is that we requested all that information from Valdez and to the date of trial he had not provided it, particularly with the Kerr and Holloway debts, particularly with those debts. And there was evidence at trial that they jimmied up those promissory notes on the Kerr side, on the Holloway, that they created some notes during this period of time. There was evidence at trial that some of the Kerr debt was for rent and food and laundry expenses. So Valdez never validated any of these debts, the majority of these debts. Those that were validated, the first chunk, they were paid. The Unisource debt was validated on October 15th as to what it was spent. And that, admittedly, that had not been paid on December 15th. But that's not enough to undo these deals. As to the vast majority of the Kerr and Holloway debts, they were never validated. And we noted that in our statement of facts. I'm sorry? Well, it's in a class of beverages called alternative beverages. And you'll chuckle, but for lack of a better explanation, it's kind of a beer slurpee. I mean, it's a beer kind of in a foam bag. Well. How appetizing. Well, you've exceeded your time by a long time. Thank you, Your Honor. That's all that's gone on here, the slurpee. Anyway. Thank you, Your Honor. I'm glad you told me that on the board of your project. Your Honor, as I noted, I had a small amount of time left, given that Mr. Crosby has gone over by a bit. If I could ask your leave to just take a couple minutes. I just wanted to pick up on the point of the discretion that Mr. Newman says he had to exercise under this agreement. And, you know, I don't have time to unwind all the statements Mr. Crosby just made. I'm going to go out and get this stuff verified. Your Honor, we did. If you look at the record, all of this was verified. And our sites are in our brief. You can go through it. All of these debts were verified, that they were incurred. They were incurred in connection with running the business. It was all verified. And, frankly, Your Honor, this unisource debt that Mr. Crosby keeps bringing up is so key. Judge Carney, at trial, right before oral argument, asked the party specifically to address this. He said, look, it seems pretty clear that this unisource debt was a business debt that was verified at least as of October, and it wasn't paid. I need the parties to address that. During trial oral argument, Mr. Crosby made the same discretion argument. He basically said, well, you know, Newman through Helo had business discretion to decide whether to pay that or not and when to pay it or not. But that just doesn't hold up. You can't say that, I mean, almost every operating agreement gives the managing member some discretion to run the business. But that doesn't mean you can breach specific terms of the operating agreement. That makes no sense. That would vitiate almost every operating agreement that people could enter into. And if that was in fact the way this contract should be interpreted, then certainly there was a unilateral mistake here. Mr. Valdez didn't understand that Mr. Newman could pay or not pay the debts whenever he chose. In fact, Mr. Newman specifically testified convincingly and with conviction that he told Mr. Valdez, show me the debts, and if it's real, I'll take care of it. He said it over and over. Just show me it's real. He didn't say, Mr. Valdez, as we go forward, I'm going to decide whether or not to pay the debts. I'm not wavering on this. Yeah. Did the district court make a finding that there wasn't proper verification? No. Never did. Unless the Court has further questions, I'll submit. Thank you. Thank you very much. Thank you. All right. We'll go to the next one.
judges: Fletcher B. , Pregerson, Graber